UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| SEASON EISENSHANK on behalf of SUE A. EISENSHANK, </br></br>                  Plaintiff,</br></br>           vs.</br></br>CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration,[1]</br></br>                  Defendant. | Cause No. 1:12-cv-601-WTL-MJD |

**ENTRY ON JUDICIAL REVIEW**

Plaintiff Season Eisenshank on behalf of Sue A. Eisenshank[2] requests judicial review of the final decision of Michael J. Astrue, former Commissioner of the Social Security Administration (the "Commissioner"), denying Eisenshank's application for Disability Insurance Benefits ("DIB") and Supplemental Social Security Income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"). The Court now rules as follows.

**I.    PROCEDURAL HISTORY**

Eisenshank filed an application for DIB on June 3, 2008, and an application for SSI on June 11, 2008, alleging disability beginning May 1, 2006, due to Graves' disease, acid reflux, lumbar and cervical spine pain, high blood pressure, and a heart problem. Eisenshank's

---

[1] Carolyn W. Colvin became Acting Commissioner of the Social Security Administration after this case was filed. She is therefore substituted as the Defendant in this case pursuant to Federal Rule of Civil Procedure 25(d).

[2] Sue Eisenshank passed away on January 3, 2011, while her claim was pending before the Appeals Council. Season Eisenshank now seeks judicial review on her behalf. "Eisenshank" hereafter refers to Sue Eisenshank.

application was initially denied on December 4, 2008, and again upon reconsideration on January 29, 2009. Thereafter, Eisenshank requested a hearing before an Administrative Law Judge ("ALJ"). The hearing was held on June 16, 2010, before ALJ Deborah Smith in Madison, Indiana. During the hearing, George E. Parsons testified as a vocational expert. On November 9, 2010, the ALJ issued a decision denying Eisenshank's application for benefits. The Appeals Council upheld the ALJ's decision and denied a request for review on March 6, 2012. This action for judicial review ensued.

## II.   EVIDENCE OF RECORD

The relevant medical evidence of record follows.

### A.  State Food Stamp and Temporary Assistance for Needy Families Application

In 2006, Eisenshank applied for assistance through the State Food Stamp and Temporary Assistance for Needy Families Programs. On May 17, 2006, Eisenshank's treating physician, Dr. David Pierson, noted that Eisenshank was "totally unable to work" and that she could "not see sufficiently to perform any type of work." Tr. at 468. On May 31, 2006, an unknown doctor also opined that Eisenshank was "totally unable to work" due to "thyroid orbitopathy with significant diptopia and blurred vision."[3] *Id.* at 281. On August 22, 2006, another unknown doctor opined that Eisenshank was still "totally unable to work" due to her thyroid related issues.[4] *Id.* at 280. On December 28, 2006, a specialist with the Cincinnati Eye Institute, Dr. Paul Brannan, noted that Eisenshank suffered from a thyroid eye disorder, proptosis, and bilateral lower eyelid

---

[3] The doctor's name was illegible.

[4] Again, the doctor's name was illegible.

retraction. He recommended surgery on Eisenshank's left eye, and stated that Eisenshank would be unable to bend, lift, or perform strenuous exercise for two weeks following surgery.[5]

### B. Dr. David Pierson and The Pain Management Group

On May 16, 2006, Eisenshank visited her treating physician, Dr. David Pierson, and complained of depression, panic attacks, anxiety, right eye pain and double vision.

On May 31, 2006, Eisenshank requested pain medication. The notes do not indicate what the pain medication was for.

On January 2, 2007, Eisenshank's treatment notes indicate that she wanted "more Vicodin for [her] eyes." *Id.* at 467. Dr. Pierson also noted that Eisenshank's blood pressure was elevated.

On February 19, 2007, Dr. Pierson noted that Eisenshank stopped taking all her medication because she was experiencing chest pain. Dr. Pierson noted that Eisenshank was "a mess." *Id.* at 466. He again expressed concern about her elevated blood pressure and opined that Eisenshank "[c]ertainly has to be a photograph in the medical textbook of Graves' disease." *Id.* at 466.

On March 13, 2007, Dr. Pierson noted that Eisenshank's blood pressure was now controlled and that she was considering "having some cosmetic eye surgery." *Id.* at 465.

On June 26, 2007, Eisenshank complained of stomach pain, nausea, and diarrhea. Dr. Pierson, however, noted as follows: "This lady comes in basically wanting pain medicine. I told her I am not going to be her pain medicine person." *Id.* at 460.

In July, 2007, Dr. Pierson referred Eisenshank to Dr. Steven J. Scheiner with The Pain Management Group for treatment of her "mid back, low back and stomach pain."[6] *Id.* at 310.

---

[5]The record does not indicate whether Eisenshank's application for benefits was granted.

3

On July 11, 2007, Dr. Scheiner noted that Eisenshank suffered from double vision, blurred vision, trouble walking, insomnia, anxiety, and depression. After examining Eisenshank, Dr. Scheiner listed Eisenshank's diagnoses as "[a]nxiety, depression, sleep disorder, [and] pain with psychological/medical factors." *Id.* at 311. Dr. Scheiner further opined that Eisenshank's "functional status and activities of daily living [were] stable at [that] time." *Id.* at 311. Dr. Scheiner prescribed Ultram for Eisenshank's pain and ordered x-rays of her back.

On July 18, 2007, Eisenshank complained that her back pain had worsened. Dr. Scheiner noted that Eisenshank's x-rays revealed lumbago and dengerative spondylosis. Dr. Scheiner ordered an MRI and physical therapy and prescribed Lortab and Cymbalta to treat Eisenshank's pain and depression. Eisenshank, however, never had an MRI while under Dr. Scheiner's care.

Two weeks later on July 31, 2007, Eisenshank complained that her pain was an eight on a scale of one to ten. During this visit, Dr. Schenier listed Eisenshank's diagnoses as lumbago, thoracic radiculopathy, thoracic spondylosis without myelopathy, muscle spasms, anxiety, depression, sleep disturbance, and pain with psychological and medical factors. She was given prescriptions for Lortab and Cymbalta.

Eisenshank continued to treat with Dr. Scheiner until the end of 2007. During that time, Dr. Scheiner prescribed Lortab, Cymbalta, Toradol, Ultram, Zanaflex, Valium, and/or Cymbalta to treat Eisenshank's pain and depression.

On December 19, 2007, Dr. Scheiner noted that Eisenshank violated the Pain Management Clinic's policies when she attempted to obtain narcotic medication from another physician. This was Eisenshank's second violation of the Pain Management Group's policies and

---

[6]The Pain Management Group, which regularly prescribes narcotic drugs, has strict policies and procedures regarding prescription medication. Patients must submit to random drug tests and agree not to abuse controlled substances.

procedures. Eisenshank had previously been "counseled regarding noncompliance" with the Pain Management Group's policies and procedures on August 29, 2007 after she obtained early refills of her prescriptions. *Id.* at 305.

Thereafter, Eisenshank was "thrown out" of the pain clinic "reportedly because she had obtained or tried to obtain narcotic pain medication from other sources." *Id.* at 19.

On February 15, 2008, Dr. Pierson expressed his frustrations with Eisenshank's treatment at the Pain Management Clinic and her inability to obtain an MRI. Dr. Pierson was upset that Eisenshank's insurance had not authorized an MRI of her back, despite his recommendations and pathology for her back pain. He also stated that Eisenshank "has become a drug addict because of pain meds not written by me." *Id.* at 525. Dr. Pierson reported that:

> [T]he reason she is back in my office is she got thrown out of the pain clinic and the reason she got thrown out of the pain clinic is because she had a kidney stone so the urologist gave her pain meds. Well, part of the contract is, if you take pain med from another doctor, you are out of the pain clinic and you are done. So now she is out of the pain clinic. Now she wants me to feed her addiction and I am not going to do it. I told her I would give her 2 weeks of medicine and that is it. Then she will try to buy it on the street.

*Id.*

On April 9, 2008, Dr. Pierson again expressed his frustrations with Eisenshank's care and stated as follows:

> This is a lady we inherited from the pain clinic. She is addicted to pain meds. She has chronic back pain. We have been fighting to get an MRI and I think we might have finally accomplished [that] today. We probably have spent 3 hours on the telephone and I really raised cane today. . . . She is the worst case of exophthalmoses[7] that I have seen. She had some polyps removed, she has had a T&A, tubal ligation, hysterectomy, history of kidney stones. She was involved in a lot of lifting when worked in the kitchen on the boat. She has a lumbar spine x-ray dated 07-13-07. It shows dextroscoliosis of the lumbar spine with degenerative spondylosis. She has ostephytes at L3 to L5. So she has pathology. She was in the pan clinic getting all kinds of drugs and then she developed a

---

[7]Exophthalmoses is a bulging of the eyes.

5

> kidney stone and apparently the worst case of exophthalmos I have seen. . . . I don't hear an S3 or S4, click or rub. Now, the straight let raising is positive at about 10 degrees bilaterally. She has normal patella reflex. There is certainly definite spasm from about the area. The paravertebral area of about T8 all the way down to L2 or 3. I mean it stands out probably ½ inch higher on the right side than the left side. It is so blatant and so outstanding, I showed it to my nurse. It is like a rock, about 2 inches wide going right down the side of her spine.

*Id.* at 520.

Finally, on April 21, 2008, Eisenshank had an MRI. After Dr. Pierson received the results from the MRI, he referred Eisenshank to the Mayfield Spine Institute for a neurosurgical consultation. According to Dr. Christopher McPerhson, Eisenshank's MRI films "demonstrated dextroscoliosis with multi-level Degenerative Disc Disease." *Id.* at 516. Despite these findings, Dr. McPherson opined that she had "no severe herniation or stenosis warranting surgery." *Id.* at 516. Dr. McPherson recommended "continued pain management with [Dr. Scheiner], for treatment of [Eisenshank's] low back pain."[8] *Id.*

On June 4, 2008, Dr. Pierson wrote on a prescription pad that Eisenshank "cannot work due to her chronic back problems." *Id.* at 604.

### C.  Dr. Ira Younger

Eisenshank began treating with ophthalmologist Dr. Ira Younger on May 24, 2006. During her visits with Dr. Younger, Eisenshank regularly complained of double vision, irritation, swelling, and trouble seeing.

According to Dr. Younger, as of August 8, 2008, Eisenshank had "significant exophthalmos as well as transient vision loss." *Id.* at 637. She also demonstrated "visual acuity that corrects to 20/40 in the right eye, compared to 20/25 in the left." *Id.* He further opined that she was

---

[8]By that time, however, Eisenshank had been terminated from the Pain Management Clinic.

6

> mildly proptopic with the left eye, more so than the right. Otherwise, her anterior and posterior segment examination[s] were fairly unremarkable. She does have reduced eye motility, especially with supraduction and abduction in both eyes. Her visual field demonstrates a decrease in sensitivity overall, with the right eye, although normalcy in the left.

*Id.*

### D.  Dr. Jennifer Gerson/Dr. John Sacco

On June 22, 2006, Eisenshank consulted with Dr. Jennifer Gerson regarding radiation treatment for her eyes. Dr. Gerson stated that Eisenshank was diagnosed with Graves' ophthalmopathy on May 26, 2006, after she "noted increased difficulties with double vision and protrusion of her eyes." *Id.* at 508. Despite the expected side effects of eye irritation, dry eye, and erythema of the skin, Eisenshank expressed a desire to proceed with the radiation treatment.

More than two years later, in August, 2008, Dr. John Sacco noted that Eisenshank had not undergone the radiation treatment after seeing Dr. Gerson "because of transportation issues." *Id.* at 631. Upon reexamination, Dr. Sacco noted that Eisenshank had "significant extraocular diminished muscle movement with paralysis of right lateral gaze. Exopthalomos [was] quite prominent bilaterally with supraneural orbital edema." *Id.* at 631. Eisenshank again expressed her desire to undergo radiation treatment. The record does not indicate whether Eisenshank ever received the radiation treatment.

### E.  IU/Clarian Health Endocrine Clinic

On November 13, 2006, Eisenshank visited the IU/Clarian Health Endocrine Clinic and complained of worsening exophthalmos with tearing, irritation in her eyes, and some decreased vision on the right side of the right eye over the last year. Dr. Helmut O. Steinberg noted that Eisenshank had been taking prednisone, a steroid, over the last eight months. She wanted to taper off the prednisone, however, because she had gained approximately sixty pounds and

experienced muscle weakness and excessive facial hair growth. Despite the side effects, Dr. Steinberg noted that Eisenshank benefited from the steroid therapy in terms of her eyes. He stated, "she still has some blurred vision and cannot drive at night or read. This also makes it hard for her to have a job. She used to be a cook and now she cannot read the tickets." *Id.* at 505.

### F.  Cincinnati Eye Institute

On October 4, 2006, Eisenshank began treating with doctors at the Cincinnati Eye Institute. During her initial visit, Dr. Paul Brannan noted that Eisenshank suffered from Graves' disease and diagnosed Eisenshank with a "thyroid eye disease" exhibited by bilateral proptosis (bulging of the eyes), lagophthalmos (inability to close the eyelids completely), corneal exposure, and right ptosis (drooping or falling of the upper or lower eyelid).

On April 10, 2007, Dr. Brannan wrote a letter to the Disability Determination Bureau regarding Eiseshank's ability to work. Although he recommended that Eisenshank undergo left orbital decompression to help with the protrusion of her left eye, he stated that Eisenshank

> [c]urrently . . . has no significant visual limitations that would prevent her from working in most professions, and her minor eye irritation can simply be treated with artificial tear drops. From an ophthalmic point of view, she can perform all her activities of daily living within reason and without limitation from her thyroid eye disease.

*Id.* at 298.

The record does not indicate whether Eisenchank underwent left orbital decompression surgery.

### G.  Dearborn County Hospital

On December 4, 2006, Eisenshank was seen in the emergency room and diagnosed with kidney stones. Dr. Pierson reviewed Eisenshank's x-rays and referred her to Midwest Urology. Dr. Michael Maggio surgically removed the stones on December 11, 2006, and inserted a stent in

her ureter. The stent was removed on December 18, 2006, and Eisenshank recovered without difficulty.

On November 2, 2007, Eisenshank was admitted to the emergency room with chest pain. The treatment notes state that Eisenshank "usually presents to the ER with her usual story of epigastric pain, nausea, vomiting and then it disappears in the ER after she is assured of admission. This time she talked about chest pain." *Id.* at 591. One EKG did show abnormalities, but subsequent EKGs were normal. The notes further state that

> [b]y 11-03 she was still coughing, epigastric pain, wanted a Demerol shot on the minute that it was appropriate. Gave her no oral pain meds. I felt she was comfortable lying flat, alert and oriented, normal bowel sounds. Touch her epigastrium with her hands and she claimed severe pain. Tell her to be real still and listen with the stethoscope and slowly apply pressure ad on approaching her vertebra nothing happened. I was really questioning this diagnosis and whether there was any real pathology. She had an EGD that showed mildly suggestive of fungal esophagitis, white flecks. Everything else was normal. On 11-04 she had a temp of 100.2. No change in her complains. Dr. Wright cathed her. No significant stenosis to explain symptoms. Seen by Dr. Grandhi [in] Dr. Shakoor's absence and he felt that she has irritable bowel syndrome. We discharged her on 11-05-07.

*Id.* at 591-92.

On December 13, 2007, Eisenshank reported to the hospital and was again diagnosed with kidney stones. The stones were removed and a stent was inserted in her bladder. The stent was removed on January 18, 2008.

On April 1, 2009, Eisenshank was admitted to the hospital after taking an entire bottle of Vicodin. Doctors had to intubate her after she exhibited intermittent unresponsiveness. After Eisenshank recovered, she denied that it was a suicide attempt.

### H.  Dr. Jane Blinzler

Eisenshank stopped seeing Dr. Pierson and began treating with Dr. Jane Blinzler in 2008. On July 6, 2008, after the hearing before the ALJ took place, Eisenshank's counsel provided the

ALJ with a note from Dr. Blinzler that read: "Mrs. Sue Eisenshank is unable to maintain meaningful employment due to double vision from graves exophthalmos and chronic back pain secondary to lumbar disc disease requiring chronic pain medications." *Id.* at 852. Shortly thereafter, Eisenshank began receiving epidural steroid injections prescribed by Dr. Blinzler. Eisenshank also began calling Dr. Blinzler's office on a regular basis requesting Vicodin or "something stronger" to treat her pain, despite already having narcotic prescriptions.

On April 23, 2009, Dr. Blinzler completed a form entitled "Multiple Impairment Questionnaire." According to the Commissioner, the form was prepared by Eisenshank's counsel. Dr. Blinzler listed Eisenshank's diagnoses as lumbar disc disease, Graves' disease with significant eye involvement, depression, and neuropathy. Dr. Blinzler further opined that "in an eight-hour day" in a "normal competitive five day a week work environment on a sustained basis," Eisenshank was only able to sit for one hour and stand or walk for zero to one hour. *Id.* at 740.

On April 14, 2010, Dr. Blinzler completed a second questionnaire. This time, Dr. Blinzler noted that Eisenshank suffers from lumbar disc disease, chronic pain, exophthalmoses, Graves' disease, and depression. Her primary symptoms were noted as low back pain and double vision. Dr. Blinzler also opined that, "in an eight-hour day" in a "normal competitive five day a week work environment on a sustained basis," Eisenshank was only able to sit for zero to one hours and stand or walk for one hour. *Id.* at 791.

### I.   Physical Consultative Exam – Dr. Mehmet Akaydin, Jr.

On September 8, 2008, Eisenshank underwent a physical consultative examination with Dr. Mehmet Akaydin, Jr. According to Dr. Akaydin, Eisenshank stated: "[W]ell, the main reason I applied is because I've got some degenerative disc disease in my lower back and severe eye

10

problems from my thyroid but I also suffer from severe anxiety and depression too." *Id.* at 658. She also stated that "the past several weeks [had] been 'very tough' for her because her primary family doctor [had] taken away all of her pain medications." *Id.* at 661.

Dr. Akaydin opined that "[a]side from her severe exophthalmos (left worse than right) she appeared to be essentially fully intact and quite functional for the most part in a gross general cognitive, physical, neurological and orthopedic sense without any overt major potentially limiting deficits of any kind being readily appreciated at present time . . ." *Id.* at 661. He also stated that Eisenshank

> should be quite capable of performing most forms of at least mildly physically strenuous type work without any overt difficulty whatsoever including those jobs that are basically of a relatively/totally sedentary and "sit-down" type nature when she could put her fully intact cognitive/intellectual and extremity skills to good effective use while at the same time placing minimal physical stress/strain on her body as a whole and on her lower back region in particular.

*Id.* at 662.

### J.  Physical RFC Assessment – Dr. R. Fife

On September 23, 2008, Dr. R. Fife reviewed Eisenshank's medical records and completed a physical RFC assessment. Dr. Fife opined that Eisenshank was able to lift and carry twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. Dr. Fife believed that Eisenshank's complaints were not as severe as she alleged.

### K.  Physical Consultative Exam – Dr. Max Henry

On November 6, 2008, Eisenshank underwent a second physical consultative examination with ophthalmologist Dr. Max Henry. Dr. Henry diagnosed Eisenshank with Graves' disease with dry eyes, eyelid involvement, and refractive error. He also noted that

11

Eisenshank's corrected vision was 20/70 on the right and 20/40 on the left. Dr. Henry did not give an opinion regarding Eisenshank's functional limitations or her ability to work.

### L.  Psychiatric Consultative Exam – Dr. Robert Kurzhals

On November 21, 2008, Eisenshank underwent a psychiatric consultative examination with Dr. Robert Kurzhals. Dr. Kurzhals noted that Eisenshank was taking Levothyroxine, Toprol, Cymbalta, Mobic, Valium, Darvocet, Famotidine, and Provestra. Dr. Kurzhals summarized his findings as follows:

> Ms. Eisenshank presented as a somewhat self-centered but friendly and cooperative woman who appeared [to] demonstrate adequate effort and persistence in the mental status exam. She complained of depression, which she primarily attributed to having to give up her sports car, which she indicated was a Plymouth Neon. She presented as a rather superficial individual.

*Id.* at 685. Dr. Kurzhals diagnosed Eisenshank with a depressive disorder, not otherwise specified, and a personality disorder, not otherwise specified. He assigned her a Global Assessment of Functioning score of 58.

### M. Death Certificate

Eisenshank passed away on January 3, 2011, due to "multidrug intoxication."

### III.     APPLICABLE STANDARD

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d) (1)(A). In order to be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work, but any other kind of gainful employment that exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, she is not disabled, despite her medical condition and other factors. 20 C.F.R. § 404.1520(b).[9] At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits her ability to perform basic work activities), she is not disabled. 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 404.1520(d). At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R. § 404.1520(f). At step five, if the claimant can perform any other work in the national economy, she is not disabled. 20 C.F.R. § 404.1520(g).

On review, the ALJ's findings of fact are conclusive and must be upheld by the court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.*, and the court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue,* 546 F.3d 456, 462 (7th Cir. 2008). The ALJ is required to articulate only a minimal, but legitimate, justification for her acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). In order to be affirmed, the ALJ must articulate her analysis of the evidence in her decision; while "[s]he is not required to address every piece of

---

[9]The Code of Federal Regulations contains separate sections relating to DIB and SSI that are identical in all respects relevant to this case. For the sake of simplicity, this Entry contains citations to DIB sections only.

evidence or testimony," she must "provide some glimpse into her reasoning . . . [and] build an accurate and logical bridge from the evidence to her conclusion." *Dixon*, 270 F.3d at 1177.

## IV. THE ALJ'S DECISION

At step one, the ALJ found that Eisenshank had not engaged in substantial gainful activity since her alleged onset date of May 1, 2006. At step two, the ALJ concluded that Eisenshank suffered from the following severe impairments: a thyroid eye disorder, degenerative disc disease, and spondylosis of the spine. At step three, the ALJ determined that Eisenshank's severe impairments did not meet or medically equal a listed impairment. At step four, the ALJ concluded that Eisenshank had the residual functional capacity ("RFC") "to perform a full range of light work." Tr. at 22. Given the RFC finding, the ALJ determined at step five that Eisenshank was capable of performing her past relevant work as a line server and cleaner. Accordingly, the ALJ concluded that Eisenshank was not disabled as defined by the Act "any time on or before the date of [her] decision." Tr. at 25.

## V. DISCUSSION

Eisenshank's daughter, Season, advances several objections to the ALJ's decision; each is addressed below.

### A. Weight Given to Treating Physician

Season argues (1) that the ALJ failed to properly weigh the opinion of her treating physician, Dr. Blinzler, and (2) that Dr. Blinzler's opinions should have been given controlling weight. The Court does not agree.

Pursuant to the regulations,

> [a] treating physician's opinion that is consistent with the record is generally entitled to "controlling weight." 20 C.F.R. § 404.1527(d)(2). An ALJ who chooses to reject a treating physician's opinion must provide a sound explanation

>   for the rejection. 20 C.F.R. § 404.1527(d)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir.2010); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir.2007).

*Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinions." *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (quoting *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)).

Season takes issue with the ALJ's treatment of Dr. Blinzler's opinion that Eisenshank was only able to sit for zero to one hour and stand or walk for one hour in an eight-hour work day. According to the ALJ,

>   Dr. Blinzler's assertion that the claimant is capable of sitting, standing and walking less than a total of two hours in an 8-hour workday is so ludicrous that it is given no weight. She would imply the claimant is bedridden 22 hours a day, which the claimant does not allege and which is totally inconsistent with her activities of daily living as she and her daughter described them, not to mention completely unsupported by the other medical evidence.

Tr. at 23.

Season argues that the ALJ did not properly grasp the context of Dr. Blinzler's opinion. Specifically, Season maintains that

>   Dr. Blinzler was asked to assess the total hours Ms. Eisenshank was able to sit and stand/walk in a "**COMPETITIVE FIVE DAY A WEEK WORK ENVIRONMENT ON A SUSTAINED BASIS**" . . . not how long Plaintiff could sit, stand, or walk outside of a workplace setting, in her own home, which is the only inquiry that would be relevant to a conclusion that Ms. Eisenshank is bedbound.  The ALJ's failure to consider the context of the statements from Dr. Blinzler was error.

Pl.'s Br. at 14-15 (emphasis in original).

15

The ALJ, however, properly considered the nature of Dr. Blinzler's opinion and provided a sound explanation for her rejection of the opinion. Dr. Blinzler's finding that Eisenshank was capable of sitting, standing and walking less than a total of two hours in a "competitive five day a week work environment on a sustained basis" would indeed imply that Eisenshank needed to lie down the remainder of the workday, thus rendering her bedbound. Because the medical evidence and Eisenshank's own testimony at the hearing did not suggest that she is bedbound, the ALJ did not error in rejecting Dr. Blinzler's opinion. Further, the ALJ considered the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinions as required by the regulations. Tr. at 19-20. As such, the ALJ's weight determination was based on substantial evidence.

### B.  Credibility Determination

Season also argues that "[t]he ALJ's failure to consider any of [the factors in SSR 96-7p] or give any other cogent reason for discounting Ms. Eisenshank's testimony on her pain and resulting limitations was error." Pl.'s Br. at 19.

With regard to Eisenshank's subjective complaints, the ALJ must make a credibility determination using the factors outlined in SSR 96-7p. "[A]n ALJ must consider . . . the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, *see* 20 C.F.R. § 404.1529(c); SSR 96–7p, and justify the finding with specific reasons." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). District courts "afford a credibility finding 'considerable deference,' and overturn [a finding] only if 'patently wrong.'" *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (quoting *Carradine v. Barnhart*, 36 F.3d 751, 758 (7th Cir. 2004)). However, "the ALJ may not discredit a claimant's testimony

about her pain and limitations solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citations omitted).

> With regard to Eisenshank's credibility, the ALJ stated as follows:
>
> The claimant's credibility is diminished by the numerous references in the record to her asking for pain medications, naming the pain mediation she wants, not taking her medications as prescribed, alleging medications had been stolen when she wanted more, etc. She was discharged by Dr. Scheiner for abusing her pain medications. Her credibility is further diminished by her alleging significant visual limitations when the specialists she saw for the problem clearly do not support its resulting in significant visual limitations, and by alleging her blood pressure is elevated when the medical evidence refutes that. Considering all that, the undersigned is unable to find the claimant credibly experiences severe pain, visual limitations or other subjective symptoms that reduce her functional capacity beyond what is established by the weight of the other evidence as set out above. Her ongoing complaints of pain to some extent may be for the purpose of obtaining more pain medications which the record shows she has abused to some extent but which she has denied.

Tr. at 24. Before reaching this credibility determination, the ALJ summarized Eisenshank's testimony at the hearing. The ALJ reported that

> [a]t the hearing, the claimant testified that her back is her most significant problem. She said that she has a stabbing pain at the base of her neck, which has gotten worse in the past three months, and also a constant low back pain and spasm. She rated her pain as an 8 on a 1 to 10 scale and said the Lidoderm patches, Neurontin and Darvocet pain medications she currently uses for it do not help much. She also said the few physical therapy sessions she had tried and chiropractic treatment just made it worse. She said that she had discussed back surgery and was told putting in a rod might not help. She said that she can sit about 15 minutes, stand 10 to 15 minutes and walk a half a block, although that last limitation was attributed to shortness of breath, not back pain. Her most comfortable position is lying down, and she does that about four hours during the day as well as at night. She said that she sleeps about four hours a night. She denies being able to lift a gallon of milk, or eight pounds. The claimant testified her vision problems are probably worse now than they were in 2006. She said her blood pressure remains high even when she takes her medications, although as noted above, Dr. Pierson's and Dr. Blinzler's treatment records do not confirm that. The claimant said that she is still depressed, and her current antidepressant, Zoloft, does not help as much as the Cymbalta she used to take.

*Id.* at 21.

As noted in the foregoing summary, the ALJ considered Eisenshank's daily activities, pain and symptoms, aggravating factors, medications, treatment, and limitations prior to reaching her credibility determination as required by SSR 96-7p., and the ALJ's credibility determination was based on the evidence of record. The Court is unable to find that the ALJ's credibility determination was patently wrong.

Season also argues that the ALJ "failed to make any credibility determination regarding the testimony provided by Ms. Eisenshank's daughter." Pl.'s Br. at 20. One of Eisenshank's daughters (not Season) testified at the hearing that

> She had thrown out some of her mother's old medications in April 2009. She did not feel her mother was abusing her painkillers, though. She just relied on them to get through the day. She said with regard to her mother's activities of daily living that the claimant tries to do the cooking, cleaning and other household chores, but her daughter, son and the son's father all help.

Tr. at 21. The ALJ did not discredit Eisenshank's daughter's testimony. Therefore, she was not required to make a credibility determination as to that testimony. *Cf. Behymer v. Apfel*, 45 F.Supp.2d 654 (N.D. Ind. 1999) (citing *Smith v. Heckler*, 735 F.2d 312, 313 (8th Cir. 1984)) ("When an ALJ fails to believe lay testimony about a claimant's allegations of pain or other symptoms, he should discuss the testimony specifically and make explicit credibility determinations.").

### C. Hypothetical and Vocational Expert's Response

Lastly, Season argues that

> [t]he ALJ in this case relied upon the Vocational Expert's testimony to find Ms. Eisenshank was able to perform her past relevant work as line server and cleaner. (Tr. 24). However, . . . the ALJ's RFC that formed the basis of [her] hypothetical question to the VE is not supported [because it did not account for Dr. Blinzler's opinion]. Therefore, the Vocational Expert's testimony in response cannot be relied [on].

18

Pl.'s Br. at 20. The Court has already determined, however, that the ALJ's rejection of Dr. Blinzler's opinion was not erroneous. Season has not alleged that the ALJ's RFC finding or the vocational expert's testimony were improper for other reasons. Accordingly, Season fails to show that the hypothetical and the vocational expert's response were not based on substantial evidence.

## VI.     CONCLUSION

In this case, the ALJ satisfied her obligation to articulate the reasons for her decision, and that decision is supported by substantial evidence in the record. Accordingly, the decision of the ALJ is **AFFIRMED**.

SO ORDERED: 05/21/2013

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana


Copies to all counsel of record via electronic communication.